**FARRELL LINES, INC., Plaintiff,**

v.

**Elizabeth Hanford DOLE, et al., Defendants.**

**SEA–LAND SERVICE, INC., Plaintiff,**

v.

**MARITIME SUBSIDY BOARD, et al., Defendants.**

**PRUDENTIAL LINES, INC., Plaintiff,**

v.

**MARITIME SUBSIDY BOARD, et al., Defendants.**

**WATERMAN STEAMSHIP CORPORATION, Plaintiff,**

v.

**MARITIME SUBSIDY BOARD, et al., Defendants.**

Civ. A. Nos. 84–3294, 84–3532, 84–3563, 85–0192.

United States District Court, District of Columbia.

Aug. 1, 1985.

Clifford J. Roth, New York City, Daniel J. Piliero, II, Tighe, Curhan & Piliero, Washington, D.C., for plaintiff Prudential Lines, Inc.

John P. Meade, Washington, D.C., for the plaintiff, Waterman SS. Corp.

Edward Aptaker, Schmeltzer, Aptaker & Sheppard, P.C., Washington, D.C., for Farrell Lines Inc.

Edward M. Shea, John E. Vargo, Washington, D.C., for plaintiff Sea-Land Service, Inc.

John H.E. Bayley, Jr., Asst. U.S. Atty., Washington, D.C., for defendants.

Sanford M. Litvack, Eric J. Lobenfeld, Donovan Leisure Newton & Irvine, Washington, D.C., New York City, for intervenor-defendant United States Lines, Inc.; Russell T. Weil, James W. Pewett, Kirlin, Campbell & Keating, Washington, D.C., of counsel.

## ORDER

OBERDORFER, District Judge.

For the reasons set forth in an accompanying Memorandum, it is this 1st day of August, 1985, hereby

ORDERED and ADJUDGED: that plaintiffs' motions for summary judgment be, and are hereby, GRANTED; and it is further

ORDERED and ADJUDGED: that defendants' and intervenor-defendant's motions for summary judgment be, and are hereby, DENIED; and it is further

ADJUDGED and DECLARED: that the Maritime Administration's October 11, 1984 refusal to reopen the proceedings in Docket S–686 was a clear abuse of discretion; and it is further

ADJUDGED and DECLARED: that the Maritime Subsidy Board's actions of June 2, 1982 and May 26, 1983, were arbitrary, caparicious, an abuse of discretion and not in accordance with law to the extent that those decisions granted intervenor-defendant United States Lines, Inc. authority to conduct nonsubsidized operations with its Jumbo Econships and with other vessels in conjunction with them; and it is further

ORDERED, ADJUDGED and DE-CREED: that these proceedings are remanded to the Maritime Administration and the Maritime Subsidy Board; and it is further

ORDERED, ADJUDGED and DE-CREED: that intervenor-defendant United States Lines, Inc., shall file, on or before August 23, 1985, an appropriate application for authority to conduct the unsubsidized operations previously authorized by the June 2, 1982 and May 23, 1983 orders; and it is further

ORDERED, ADJUDGED and DE-CREED: that the Maritime Administration and the Maritime Subsidy Board shall thereafter provide notice of that application and an opportunity for interested parties to comment on it; and it is further

ORDERED, ADJUDGED and DE-CREED: that MarAd shall, as expeditiously as possible, enter a reasoned decision addressing the issues raised in the comments submitted by interested parties.

## MEMORANDUM

The four plaintiffs in these consolidated cases are U.S.-flag carriers that challenge the decision of the Maritime Administration ("MarAd") to authorize intervenor-defendant United States Lines ("USL") to begin a new, unsubsidized round-the-world service using fourteen new containerships known as Jumbo Econships. Plaintiffs claim that MarAd's decision was arbitrary and capricious because the Maritime Subsidy Board ("Board"), which was charged with making the initial determination in this case, did not provide adequate notice or a hearing before reaching its decision and failed to ascertain the adequacy of United States-flag shipping on the trade routes affected by USL's planned unsubsidized service. The action is now before the Court on the parties' cross-motions for summary judgment.[1]

### I.

The Merchant Marine Act of 1936, 46 U.S.C. § 1101 *et seq.*, authorizes MarAd to subsidize the construction and operation of

---

**1.** The pending cross-motions are styled as motions for summary judgment and will be treated as such for purposes of determining (1) whether this action is barred by laches; and (2) the nature of the equitable relief to which plaintiffs may be entitled. To the extent that the motions seek review of agency action, they will be treated as motions for judgment on the administrative record. *See Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (*per curiam*); *Aeron Marine Shipping Co. v. United States,* 525 F.Supp. 527, 544–45 (D.D.C. 1981), *modified on other grounds,* 695 F.2d 567 (D.C.Cir.1982).

U.S.-flag vessels in foreign trade. Specifically, the Act enables MarAd to enter into "operating-differential subsidy" (ODS) contracts with U.S.-flag shippers. 46 U.S.C. § 1173. The amount of the subsidy is the difference between the domestic costs of operating ships on a given trade route and the corresponding costs incurred by foreign competition, or such lesser amount as the parties may agree upon. 46 U.S.C. § 1173(b). The subsidy is intended to foster foreign commerce and a strong merchant marine.

For many years, USL operated its ships on Trade Routes 5, 7, 8, 9 and 11 (U.S. Atlantic/North Europe) and 12 and 29 (U.S. Atlantic and Pacific/Far East) without subsidy. In November of 1980, USL applied to MarAd to acquire the interest of plaintiff Farrell Lines, Inc. ("Farrell") in two vessels, as well as Farrell's rights to ODS on the U.S. North Atlantic/North Europe and U.S. Atlantic/Far East trade routes. R. at 1–105. USL also asked MarAd

> to permit unrestricted voyages, in terms of numbers and places served, by U.S. Lines or by any affiliated company on trade routes or services not covered by the Subsidy Contracts, by vessels not subject to the Subsidy Contracts and by vessels, subsidized or unsubsidized, on the Trade Routes without regard to the minimum/maximum number of sailings for which ODS will be paid.

R. at 5–6. A summary of USL's application was published at 45 Fed.Reg. 77,099 (1980); R. at 36. In comments responding

to this notice, plaintiff Sea-Land Service, Inc. ("Sea-Land") and others opposed the part of USL's application that would permit unlimited unsubsidized operations by subsidized and unsubsidized vessels. R. at 106, 118–120.

On January 9, 1981, the Board and USL entered into ODS contract MA/MSB–483. The Board thus approved the transfer of Farrell's ODS rights. It also emphasized that USL's application for unsubsidized services did not warrant a hearing under section 605(c) of the Merchant Marine Act, 46 U.S.C. § 1175(c),[2] since "such application is not for additional service on [the U.S. North Atlantic/North Europe trade route] and section 605(c) does not extend to unsubsidized service." The Board further held that inclusion of USL's existing unsubsidized operations in the contract was "expressly not subject to [General Order 80], inasmuch as, among other reasons, such nonsubsidized operations will be authorized by USL's ODSA." R. at 158.[3]

On February 17, 1981, USL applied for a twenty-year ODS contract under which it would receive subsidies on two trade routes on which it was already providing the services proposed to be subsidized. The application described USL's proposed subsidized service and, in connection with that service, requested permission to undertake

> an unrestricted number of voyages without subsidy by new or existing vessels of U.S. Lines or an affiliated company, on trade routes and services for which it

---

**2.** Section 605(c) provides, among other things, that:

> No contract shall be made under this title with respect to a vessel to be operated in an essential service served by citizens of the United States which would be in addition to the existing service, or services, unless the Secretary of Transportation shall determine after proper hearing of all parties that the service already provided by vessels of United States registry is inadequate, and that in the accomplishment of the purposes and policy of this Chapter additional vessels should be operated thereon. . . .

The Secretary has delegated this task to the Maritime Administrator, who has in turn delegated it to the Maritime Subsidy Board.

**3.** General Order 80 is set forth at 46 C.F.R. §§ 281.11–281.17. Among other things, General Order 80 requires (1) that each application to undertake an unsubsidized voyage show a "definite need" for the proposed voyage, 46 C.F.R. § 281.15(a); and (2) that, in certain circumstances, applicants must obtain the written consent of U.S.-flag operators providing service on the route to be served, 46 C.F.R. § 281.11(d). The General Order also authorizes the Maritime Administrator to call an informal public hearing when the proposed unsubsidized operations are or may become a regular service, and requires that any such hearing shall consider the adequacy of existing U.S.-flag service on the trade route on which the proposed nonsubsidized service is to be performed. 46 C.F.R. § 281.13.

receives subsidy or on trade routes and services for which it does not receive subsidy, so long as U.S. Lines fulfills its obligations under its subsidy agreement. R. at 177. USL's application was noticed in the *Federal Register*, where it was assigned Docket No. S–686. 46 Fed.Reg. 19,015 (1981); R. at 226–27. American President Lines and plaintiffs Sea-Land and Waterman Steamship Corporation ("Waterman") submitted comments objecting to USL's application for nonsubsidized service. R. at 238–40, 244, 258.

The Board issued a decision in Docket S–686 on July 16, 1981. R. at 302–312. First, the Board held that section 605(c) of the Merchant Marine Act[4] did not bar award of an ODS contract for USL's existing subsidized services on certain trade routes. R. at 312. Second, the Board reiterated its view that section 605(c) does not apply to unsubsidized operations. However, "because of the alleged undue advantage and prejudice that follow from grant of the unsubsidized privileges requested by USL and because of the critical nature of the requested unsubsidized service to the opposition of several parties," the Board exercised its discretion to address USL's request for unsubsidized services. R. at 310. The Board concluded that:

The issue of the appropriate flexibility of unsubsidized service for subsidized operators is a broad issue of far reaching policy implications, as the intervenors have made plain. The matter is appropriate for the Board to address with respect to all subsidized operators. *In the meantime, USL will be subject to the provisions of [General Order 80], as are other operators.*

R. at 311 (emphasis added). In addition, the Board noted in its findings and conclusions that "USL's requested unsubsidized services will be subject to [General Order 80] under any ODSA awarded." R. at 312.

On April 23, 1982 Farrell reached an agreement in principle under which it was to sell two vessels to USL. R. at 393–402. Three days later, USL's president wrote to the Maritime Administrator and proposed to amend the twenty-year ODS contract, which had been approved in Docket S–686 but not yet awarded, in order to create a new agreement with a term of five years. R. at 403–05. Among other things, USL offered to construct without subsidy fourteen Jumbo Econships, to be operated under U.S.-flag with American crews. R. at 404. In exchange, USL proposed that under the new contract it would "have the absolute right and flexibility ... to operate the new Jumbo Econships together with a complement of feeder vessels and any other vessels in any legal trade route on an *unsubsidized* basis." *Id.* (emphasis added). The letter by which this proposal was made did not, however, explain how or where USL intended to operate the Jumbo Econships. Moreover, the record contains no indication that the participants in Docket S–686—including plaintiffs Sea Land, Waterman and Prudential Lines, Inc. ("Prudential")—received any notice of USL's proposal.

According to the minutes of a Board meeting held on June 2, 1982, USL's proposal was accepted when the Board approved Amended and Restated ODS Contract No. MA/MSB–483 ("Amended Contract"), which was characterized as an amendment to the ODS agreement approved in Docket S–686. R. at 411–44. By letters dated June 2, 1982, MarAd notified USL and Farrell of the Board's decision. R. at 445–81. USL and Farrell later accepted the Amended Contract. R. at 482–507.

The Amended Contract permitted USL to acquire two vessels belonging to plaintiff Farrell. It also featured a reduction in ODS otherwise payable to USL annually, a cap on the total amount of ODS payable to USL, termination of subsidy on affected trade routes after five years, and an obligation to construct fourteen Jumbo Econships. In addition, the Amended Contract authorized USL to operate the Jumbo

---

**4.** *See* note 2 *supra.*

Econships and certain other ships in USL's fleet

> on [USL's] existing services up to the maximums for such services specified in Appendix A (minus the number of subsidized sailings made by USL's existing vessels) and on USL's Round-the-World service or any constituent leg of such service on a non-subsidized basis up to a maximum of 52 sailings annually
>
> . . . .

R. at 431. The Board did not, however, apply General Order 80 in considering whether to grant USL's request for unsubsidized service. R. at 415.

The Amended Contract was later described in a MarAd press release. R. at 508. The press release did not reveal any details about USL's proposed unsubsidized service, noting only that MarAd had granted USL permission to build fourteen large containerships and that these vessels would not be receiving construction or operating subsidies. *Id.*

American President Lines and plaintiff Waterman eventually requested review by the Secretary of Transportation. R. at 509–29. American President Lines criticized the adequacy of notice, and Waterman asked that MarAd be required to hold a full hearing on USL's requests. R. at 527, 513. Plaintiffs Sea-Land and Prudential did not seek Secretarial review at all. USL and Farrell requested that the Secretary decline to review MarAd's decision. R. at 531–64. On June 28, 1982 the Secretary decided not to review the matter. R. at 565, 581–83. All of the parties in Docket S–686, including plaintiffs in this action, received notice of the Secretary's decision. R. at 566–67. However, no carrier sought judicial review. On June 29, 1982, USL's contract was formally amended and restated to conform with the June 2 decision. R. at 890–907.

On January 26, 1983, Farrell and USL jointly submitted a letter to the Board seeking permission to transfer Farrell's subsidized service on the U.S. Atlantic and Gulf/Australia and New Zealand trade route to USL, along with four vessels. Notice of this application was published in the *Federal Register.* 48 Fed.Reg. 9,122 (1983); R. at 654. On May 23, 1983, the Board approved this arrangement and incorporated authority for the new service into USL's Amended Contract. R. at 662–719. The Board also included provisions permitting nonsubsidized operations nearly identical to those described in the June 2 order. R. at 694.

On February 17, 1984, plaintiff Farrell wrote to the Maritime Administrator requesting clarification of the portions of the Amended Contract that authorize operation of USL's Jumbo Econships in a round-the-world service or leg of such service. R. at 752–55. Farrell had assumed that the Amended Contract merely permitted USL to link up its existing service on certain trade routes in order to form a continuous Round-the-World service. But this assumption was apparently jarred by unspecified "recent developments" which indicated

> that USL's authority to make unsubsidized Round-the-World voyages may be interpreted as permitting USL to inaugurate a service of as many as 104 voyages in Trade Routes 10/13 in direct competition with Farrell's long-standing service in those routes.

*Id.* at 753–54. Farrell argued that MarAd could not permit the operation of such unsubsidized service without inquiring into the competitive effects of that service and that, at a minimum, Farrell should have received notice and an opportunity to comment on USL's proposed unsubsidized service. *Id.* at 754–55. R. at 756–63. On May 24, 1984, the Maritime Administrator denied Farrell's requested clarification as "untimely." R. at 767.

Sea-Land noted this exchange of correspondence and submitted its own letter and legal memorandum on June 22, 1984. R. at 769–98. Sea-Land argued that USL could not undertake a broad round-the-world service without further action by MarAd, subject to notice and an opportunity for comment by affected U.S.-flag carriers. R. at 772. On June 13 and July 23, Farrell sub-

mitted letters responding to the Maritime Administrator's May 24, 1984 decision. R. at 768, 799–806.

The Maritime Administrator denied these requests on October 11, 1984, reasoning that USL's proposed round-the-world service fell within the terms of the Amended Contract, that interested parties had had an opportunity to comment on USL's 1981 application for that contract, and that no further proceedings were necessary before the service was initiated. R. at 807–812. Moreover, the Maritime Administrator informed Prudential[5] and Farrell that "[o]ne constituent leg of [USL's] proposed service includes the Mediterranean trade in which your compan[ies] also operate[ ]." R. at 809, 811. The plaintiffs initiated separate suits shortly thereafter, and these related actions were later consolidated.

Plaintiffs fear that the enormous capacity of the Jumbo Econships will effectively prevent them from competing on USL's unsubsidized trade routes. They argue that this result is at odds with the purposes of the Merchant Marine Act, which was intended to strengthen America's merchant marine. Plaintiffs have therefore asked the Court to vacate MarAd's June 2, 1982 and May 23, 1983 decisions to authorize USL to conduct unsubsidized operations.

## II.

At the outset, defendant and USL assert that this action is barred by laches. To determine the merit of this claim, it is necessary to identify the decisions that the plaintiffs are challenging. After Farrell's request for clarification was denied in May of 1984, Farrell, Prudential and Sea-Land wrote letters explaining their concern about the rumored breadth of USL's round-the-world service. In essence, all three requested that the administrative record be reopened in order to give them an opportunity to be heard. See 46 C.F.R. §§ 201.-171–201.175 (1984).

Our Court of Appeals has observed that if an agency declines to reopen, "that deci-

sion itself [is] a statutorily reviewable order." *City of Rochester v. Bond*, 603 F.2d 927, 938 (D.C.Cir.1979) (footnote omitted). Indeed, the plaintiffs concede that the October 11, 1984 refusal to reopen "was the impetus for these suits." Statement of Points and Authorities of Sea-Land Service, Inc. in Support of Plaintiffs' Joint Motion for Summary Judgment at 2. Thus, it is first necessary to review "the agency's reasons for not reconsidering its earlier order." *Id.; accord Northern Colorado Water Conservancy District v. FERC*, 730 F.2d 1509, 1515 (D.C.Cir.1984).

■ Laches applies only where plaintiffs have failed to exercise due diligence in ascertaining their rights. *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 843 (D.C.Cir.1982). Plaintiffs' attack on MarAd's October 11, 1984 refusal to reopen is clearly not barred by laches because the plaintiffs brought suit promptly after the Board announced its decision.

■ Thus, the threshold task before the Court is to review the October 11 decision. The standard of review is well-established: MarAd's refusal to reopen may be reversed only if that refusal amounted to a clear abuse of discretion. *See American Maritime Association v. United States*, 766 F.2d 545, 556–57 (D.C.Cir.1985) (citing *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 294–96, 95 S.Ct. 438, 446–47, 42 L.Ed.2d 447 (1974)); *Deukmejian v. NRC*, 751 F.2d 1287, 1317–18 (D.C.Cir.1984).

MarAd's October 11 letters and the order denying Farrell's request for clarification indicate that the agency had four reasons for concluding, in effect, that the plaintiffs had not shown "good cause" for failing to request reopening at an earlier date. 46 C.F.R. § 201.172 (1984). First, the plaintiffs assertedly had an opportunity to comment when USL's 1981 application for an ODS contract was published in the *Federal Register*. Second, plaintiffs allegedly could have sought timely review of Mar-

---

**5.** The Maritime Administrator refers to Prudential's letter of September 17, 1984, R. at 809, but this letter does not appear in the administrative record.

Ad's June 2 grant of unlimited unsubsidized authority to USL. Third, MarAd emphasized that USL had already committed substantial resources in reliance on the June 2 order. Finally, MarAd reasoned that General Order 80, under which the plaintiffs wished to test USL's planned unsubsidized service, simply did not apply to the June 2 decision. *See* R. at 766–67, 809–12. Although neither Waterman nor Sea-Land pressed for a reopening, it is clear that MarAd would have denied such a request for the reasons given in the October 11, 1984 letters; accordingly, the refusal to reopen may be treated as exhausting the administrative remedies of all of the plaintiffs.

   ■ The Board's assertion that the 1981 *Federal Register* notice was adequate for purposes of USL's 1982 application is clearly erroneous. First, USL had on two previous occasions applied for authority to conduct nonsubsidized services; on both occassions, the Board provided notice and gave interested parties an opportunity to comment. *See* 45 Fed.Reg. 77,099 (1980); 46 Fed.Reg. 19,015 (1981). The Board offered no justification for its failure to engage in similar notice and comment proceedings when USL renewed its request for unsubsidized service in May of 1982. Such an unexplained deviation was unreasonable. *Cf. Natural Resources Defense Council, Inc. v. Herrington*, 768 F.2d 1355, 1431 (D.C.Cir.1985). Second, the 1981 notice said nothing at all about Jumbo Econships, the huge vessels that formed a crucial element of USL's 1982 proposal. Even the Board acknowledged that the grant of unsubsidized authority for those ships was "a significant departure from authority previously granted to USL." R. at 421. Indeed, the Board has since conceded that "USL launched a service that was unprecedented and utterly new to the United States merchant marine." Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss at 37. Because USL's 1982 plans "differed in fundamental respects from"[6] the 1981 notice, it was a

clear abuse of discretion for MarAd to conclude that such notice was adequate.

   Even assuming that the 1981 *Federal Register* notice was adequate, MarAd subsequently misled interested parties to believe that they would have a further opportunity to make their views known. The Board's July 16, 1981 decision in Docket S–686 emphasized the importance of the unsubsidized service issue and added that the Board would address it "with respect to *all* subsidized operators." R. at 310–11 (emphasis added). The decision added that "[i]n the meantime, USL will be subject to the provisions of [General Order 80]," a regulation which sets forth detailed administrative procedures. R. at 311; *see* note 3 *supra.* MarAd's statement created in the interested parties a legitimate expectation that USL would not be granted unlimited authority to conduct unsubsidized services in the absence of further proceedings. The parties were thus assured that they would receive *further* notice of MarAd's plans with regard to the unsubsidized service issue; the 1981 notice simply has no bearing on MarAd's subsequent failure to satisfy this obligation.

   ■ Similarly, the plaintiffs that declined to seek Secretarial review of the June 2, 1982 decision were justified in their failure to do so. The 1981 decision in Docket S–686 held that MarAd would not grant USL's request to conduct unlimited, unsubsidized operations in the absence of a proceeding calculated to explore such "a broad issue of far reaching policy implications." R. at 311. But MarAd issued the June 2 order without giving notice of USL's request to modify substantially the original ODS contract. Moreover, although the Amended Contract authorized USL to operate Jumbo Econships on USL's round-the-world service, it did not specify the trade routes that such service would involve. R. at 431. Since interested parties were at that time relying on MarAd's promise to conduct further proceedings, they had no reason to suspect that MarAd

---

6. *Independent U.S. Tanker Owners Committee v.*    *Lewis*, 690 F.2d 908, 926 (D.C.Cir.1982).

had granted USL broad authority to conduct unsubsidized operations that would compete directly with the services offered by plaintiffs. The Secretary himself emphasized that the Amended Contract differed from the ODS Agreement described in the 1981 notice principally in that it "approved ODS for five years instead of twenty years duration and limited the award to wage costs" and also "required United States Lines to build the new jumbo container vessels." R. at 583. The Secretary did not suggest that USL had been granted the broad unsubsidized authority that had been denied in the decision in Docket S–686. In short, neither the June 2 decision nor the Secretary's denial of the requests for review suggested that MarAd was doing something other than what it had promised to do in 1981.

Because the Board had expressly conceded the importance of the unsubsidized authority issue in 1981, it was under an obligation to explain exactly what it was doing when it later made a decision on that issue. The Board's failure to justify its June 2, 1982 decision in the context of its earlier promise lulled interested parties into the false belief that USL had not been granted sweeping authority. MarAd's refusal to reopen was in effect an attempt to lay the blame for the Board's imprecision on the parties; as such, the refusal was a clear abuse of discretion.

Even if the plaintiffs had been aware of what the Board intended, it is unlikely that they could have successfully pressed the issue at that time. The Board had earlier stated that it would not review the permissibility of operations under an ODS contract unless those operations were occurring or about to occur. Specifically, the Board noted "the inadvisability of ruling on theoretical operational movements that may vary significantly from services actually performed" and held that it would "review such service at such time as there is an actual service or prudent belief that there reasonably is likely to be such a service." *Lykes Bros. Steamship Co.,* 20 S.R.R. 987, 991 (Maritime Subsidy Board 1981). In authorizing USL's Amended Contract, the Board conceded that "vessel deployment after the commencement of delivery of the new vessels, as well as numbers of vessels deployed, are unknown at present." R. at 421.· Moreover, the application before the Board did not specify whether USL's proposed unsubsidized service would be eastbound or westbound. Thus, the plaintiffs could not have made their case to the Board until USL revealed its plans.

■ The record before MarAd on October 11, 1984 contained no specific explanation of USL's round-the-world service. In light of existing agency precedent, there was no basis for MarAd's holding that it was *too late* for the requesters to challenge the June 2 decision. In this case, plaintiffs' "untimeliness [was] excusable" and it was "an abuse of discretion to reject the petition." *City of Rochester v. Bond, supra,* 603 F.2d at 938 n. 61.

■ MarAd also asserted that USL's investment in the Jumbo Econships precluded further consideration of the issues raised by the June 2 decision. But there is no indication in the record that MarAd ever conducted any inquiry to determine whether and to what extent USL actually relied on the Amended Contract approved by the June 2 order. Thus, MarAd's implied finding that USL had relied to its detriment *because of the amended contract* is based on nothing more than USL's assertions to that effect. In any event, while USL's reliance might limit the remedy that could be afforded to the parties requesting reopening, it would not prevent MarAd from inquiring into the legal issues raised in the requests. Because MarAd concluded otherwise, its refusal to reopen was a clear abuse of discretion.

Although the October 11, 1984 letters implicitly focused on the question of whether the request to reopen was timely, they also addressed a final issue central to the plaintiffs' claim: whether the Board should have considered USL's application for an amended ODS contract in the context of General Order 80, 46 C.F.R. § 281.11–281.-

17. In its 1981 decision in Docket S–686, the Board explicitly noted the significance of the unsubsidized authority issue,[7] declined to decide it, and added that pending an opportunity to consider the matter "with respect to all subsidized operators.... *USL will be subject to the provisions of [General Order 80], as are other operators.*" R. at 311 (emphasis added); *see also* R. at 312.

The June 2, 1982 decision and MarAd's October 11, 1984 letters indicate that the Board considered General Order 80 but concluded that it was not relevant to USL's application for an amended contract. 46 C.F.R. § 281.11(b)(1) states that General Order 80 does not apply to:

> Non-subsidized voyages *specifically authorized* by the operating-differential subsidy contract of the operator ... which voyages will be acted on under the provisions of the operator's operating-differential subsidy agreement....

The Board determined that USL's proposed unsubsidized operations were not subject to General Order 80 because "such nonsubsidized operations will be authorized by USL's amended and restated ODSA." R. at 431. Similarly, MarAd held that "[t]he non-subsidized operations of the Jumbo Econships in the Round-the-World service are specifically authorized in USL's ODS Agreement No. MA/MSB–483, as amended and restated" and that General Order 80 therefore did not apply. R. at 810, 812. The question is whether it was a clear abuse of discretion for MarAd to conclude that the proposed unsubsidized service was "specifically authorized" by USL's Amended Contract.

Deference to MarAd's interpretation of General Order 80 "is due only when the interpretation 'is reasonable and consistent with the regulation.'" *Miller v. Bond*, 641 F.2d 997, 1002 (D.C.Cir.1981) (citations omitted) (quoting *Belco Petroleum Corp. v. FERC*, 589 F.2d 680, 685 (D.C.Cir.1978)). Thus, the Court need not accept MarAd's interpretation if it is "manifestly unreasonable." *American Maritime Association, supra,* at 560.

The Board had earlier interpreted section 281.11(b)(1) to mean that General Order 80 does not apply to continued post-contract operation of a pre-contract unsubsidized service. Thus, "the Board in its grant of a subsidy contract to USL on January 9, 1981 permitted *specified* unsubsidized operations so that USL could continue its *existing* unsubsidized service." R. at 311 (emphasis added). In short, a request that proposes merely to continue an already existing nonsubsidized service need not be considered under the General Order.

But MarAd's holding goes much farther, implying that the Board could avoid the effect of General Order 80 by the expedient of "specifically authorizing" an entirely new unsubsidized service in an ODS contract amendment. In other words, the propriety of extensive unsubsidized service— which the Board had earlier described as "a broad issue of far reaching policy implications"[8]—was to be disposed of, without notice to any of the parties involved in Docket S–686, by simply writing the disputed service into USL's Amended Contract. By holding, in effect, that General Order 80 does not apply when the Board chooses to characterize a given action as a contract amendment rather than an order, MarAd effectively renders General Order 80 a nullity.

Moreover, MarAd's interpretation makes a mockery of its earlier promise that USL would be subject to the provisions of General Order 80. In its decision in Docket S–686, the Board stated that General Order 80 requires subsidized operators "to obtain approval prior to making unsubsidized voyages." R. at 311. For that reason, the Board emphasized that "[i]t does not follow that there are no restrictions on unsubsidized operations as contended by USL." R. at 311. The Board then explicitly guaranteed that USL would be subject to General Order 80. R. at 311–12. That promise was

---

**7.** *See* pp. 301–302 *supra.*

**8.** R. at 311.

plainly misleading if the procedures set forth in General Order 80 could be sidestepped by using an amended contract instead of making a decision pursuant to the General Order. An agency "is not free to set policies in formal decisions and then vary from the policies in less formal rulings involving the same situation." *Distrigas of Massachusetts Corp. v. FPC,* 517 F.2d 761, 766 (1st Cir.1975). Yet that is exactly what MarAd has done here.

■ Even assuming that General Order 80 could be interpreted as MarAd has, the Amended Contract simply does not *"specifically* authorize" USL's proposed non-subsidized voyages. Indeed, the Board flatly stated that "vessel deployment after the commencement of delivery of the new vessels, as well as numbers of vessels deployed, are *unknown* at present." R. at 421 (emphasis added). Moreover, the Board apparently had no itinerary before it. Since the Board did not know exactly what it was authorizing, it cannot be said that anything was *specifically* authorized. Even under its own interpretation, then, the Board was obligated to consider USL's application pursuant to General Order 80. MarAd's refusal to do so was a clear abuse of discretion.

Plaintiffs were denied an opportunity to press their claims before the Board because they had no notice of the proceedings leading up to the June 2 decision, and because they received no adequate notice of its consequences before MarAd issued its decision refusing to reopen Docket S–686. The Board clearly abused its discretion in denying plaintiffs' requests to reopen.

### III.

■ Having determined that MarAd's October 11 refusal to reopen was a clear abuse of discretion, the next question is whether laches bars plaintiffs' challenge to the June 2, 1982 order and the related May 23, 1983 contract. The record contains no clear statement about the trade routes on which USL was planning to operate its round-the-world service. Thus, the plaintiffs had no reason to know that their rights were threatened. Moreover, the Board's 1981 decision in docket S–686 affirmatively misled the plaintiffs to believe that they were entitled to further administrative proceedings before the Board authorized a service that would affect their rights.

The additional material presented in the motions for summary judgment does not alter this conclusion. The plaintiffs did not know until the fall of 1984 that USL's proposed service would compete directly with their services. *See* Skouras Affidavit at ¶¶ 24–28 (March 15, 1985); Staunton Affidavit at ¶¶ 10, 14–15. The plaintiffs may not be accused of lack of diligence for failing to discover the particulars of USL's proposed service at an earlier date.

In any event, the plaintiffs would not have been able to seek judicial review until USL's proposal had assumed a discernible form. A suit brought before plaintiffs knew that their rights were threatened would have been dismissed because the effect of the Board's decision would not yet have been "felt in a concrete way." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). Because plaintiffs were justifiably ignorant of the threat to their rights until late 1984, their suit is not barred by laches. *See Allen v. Carmen,* 578 F.Supp. 951, 963 (D.D.C.1983).

Accordingly, the June 2 decision may be reviewed by the Court. The standard of review is whether the Board's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

■ The Board did not provide notice or an opportunity to comment on USL's May 1984 application to undertake extensive unsubsidized services. This omission was contrary to the Board's established practice of giving the parties notice of USL's appli-

cations for unsubsidized service. *See* p. 305 *supra*. Moreover, the failure to provide notice is manifestly inconsistent with the language of the 1981 decision in Docket S–686, which held that USL's application raised a very important issue warranting careful consideration under General Order 80. *See* pp. 301–02 *supra*. The Board's failure to adhere to the principles that it had announced in its earlier decisions is by itself sufficient reason to hold that the Board's June 2, 1982 order was arbitrary, capricious and an abuse of discretion.

■ Moreover, sound principles of administrative decision making require that important actions be taken only after the agency compiles an adequate record and announces a reasoned decision sufficient to provide a basis for judicial review. As our Court of Appeals has held in a similar case:

> The distinct and steady trend of the courts has been to demand in informal adjudications procedures similar to those already required in informal rulemaking. Courts have required *some explanation* for agency action and, to ensure the adequacy of that explanation, some opportunity for interested parties to be informed of and comment upon the relevant evidence before the agency. Thus, despite the Supreme Court's dictum in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* [435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1980),] that courts may not add to the procedural requirements of the APA except in "extremely rare" circumstances, we are justified in demanding some sort of procedures for notice, comment, and a statement of reasons as a necessary means of carrying out our responsibility for a thorough and searching review.

*Independent U.S. Tanker Owners Committee v. Lewis,* 690 F.2d 908, 922–23 (D.C. Cir.1982) (footnotes omitted) (emphasis in original). Moreover, like the interim rule in *Tanker Owners,* General Order 80 gives this demand "a more concrete form" because "[i]t states the procedures MarAd must follow in considering applications" for authority to conduct unsubsidized services. *Id.* at 923.

The wisdom of this admonition becomes clear after considering what the Board has failed to do in this case. The Board acknowledged that

> The non-subsidized operational flexibility requested by USL does represent a significant departure from authority previously granted to USL or any other subsidized operator. It will, in effect, enable USL to compete on a non-subsidized basis with virtually every other subsidized operator.

R. at 421. The Board then went on to concede that "[t]he impact of this competition is difficult to assess at this time" and that the number of vessels involved and their deployment was unknown. *Id.* Despite this lack of important information, the Board speculated that no harm would occur if it simply granted USL the authority to conduct the requested unsubsidized services for a period of five years. Apart from the fact that the Board offered no reason to support its conclusion that a mere five year contract would not raise the crucial issues that it had just identified, the assumption that the contract would last for only five years also proved to be unfounded. On May 23, 1983, USL obtained subsidy rights on trade routes purchased from Farrell; as part of the resulting ODS contract, USL received authority virtually identical to that granted in the June 2, 1982 decision. The May 23 contract, however, lasts until 1995. The record thus suggests that the Board rushed to a decision without taking the time to balance carefully the potential consequences of its action. It did not create a record responding to the reasoned views of interested parties.

As a result, the Board failed to grapple with a number of issues that the parties now claim to be pivotal. For example, the plaintiffs argue that General Order 80 en-

titles them to a hearing, as well as findings concerning the adequacy of U.S.-flag service on affected trade routes. In part because plaintiffs had no notice or opportunity to comment before the June 2, 1982 decision, MarAd did not pass on that question. The plaintiffs also contend that the Merchant Marine Act itself requires the Board to conduct a hearing or at least to make factual findings. The Court of Appeals has held that section 605(c) of the Act does not impose such a hearing or fact-finding requirement on requests for authority to conduct unsubsidized operations. *Sea Land Service, Inc. v. Dole,* 723 F.2d 975, 979 (D.C.Cir.1983), *cert. denied,* — U.S. ——, 105 S.Ct. 103, 83 L.Ed.2d 47 (1984). However, the court explicitly declined to decide "whether the Secretary can permit nonsubsidized operations of contract vessels without considering the impact upon essential services thereby affected." *Id.* at 978. The Court of Appeals also did not decide whether "equivalent standards or lesser standards should be inferred from the totality of the Act." *Id.* at 978 n. 3. Again, the Board's precipitous 1982 action deprived the plaintiffs of the opportunity to press these important issues before the administrative agency properly charged with deciding them in the first instance.

Other important issues suffer from the paucity of the Board's reasoning. The Board noted, for example, that the recent Snyder Amendment, 46 U.S.C. § 1184(a),[9] "indicates that unfettered, unsubsidized operations, at least for a limited time period ... [are] not inconsistent with the Act." R. at 420. It is not clear whether the Board was suggesting that the Snyder Amendment simply limited its discretion to hold hearings pursuant to an otherwise applicable General Order 80, or whether it meant instead that the Snyder Amendment had of its own force nullified the General Order—a proposition that would conflict with the well-established rule that an agency may alter a regulation only by resort to appropriate administrative procedures. *See Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *National Wildlife Federation v. Clark,* No. 83–2648 slip op. at 2 (D.D.C. October 3, 1984).

The Board must be given an opportunity to develop an adequate record and to articulate a reasoned basis for its decision. *See American Maritime Association, supra,* 558–59. On remand, "MarAd should permit a new round of comments upon the application and publish a thorough and reasoned explanation for whatever decision is reached." *Independent U.S. Tanker Owners, supra,* 690 F.2d at 931.

IV.

There remains the question of the relief to which plaintiffs are entitled as a matter of equity. It is undisputed that in reliance on the June 2, 1982 decision, USL has spent over one billion dollars on Jumbo Econships, port facilities and support services. Verdon Affidavit at ¶ 22. These arrangements involve extensive financing, numerous contracts and hundreds of new jobs. Verdon Supplemental Affidavit at ¶ 5. USL would almost certainly be seriously harmed if its proposed service were simply cancelled at this time.

On the other hand, there is the risk that plaintiffs will be unfairly harmed if USL is allowed to go forward. The Board has recognized that USL's nonsubsidized service will have a substantial though unpredictable impact on USL's competitors. R. at 421. For example, the uncontroverted portions of the affidavit of Vincent P. Staunton, Staff Vice President of Pricing

---

**9.** The Snyder Amendment provides that under certain circumstances

[a]ny operator receiving operating differential subsidy funds may elect, for all or a portion of its ships, to suspend its operating differen-

tial subsidy contract with all attendant statutory and contractual restrictions, except as to those pertaining to the domestic intercoastal or coastwide service, including any agreement providing for the replacement of vessels. ...

and Regulatory Services at Sea-Land, establish that the proposed service "would provide USL with more than enough *additional* annual one-way capacity to carry *every load* which Sea-Land's U.S.-flag vessels have carried in thise trades in any years since those services began." Staunton Affidavit at ¶ 16 (emphasis in original). Similarly, Waterman may face grave financial difficulties because of USL's activities. The exigencies of the shipping industry have already driven Waterman into reorganization under Chapter 11 of the Bankruptcy Code. The enormous carrying capacity of USL's planned unsubsidized service poses a competitive threat that might prevent Waterman from recovering. *See* Affidavit of Joseph M. Farrell at ¶¶ 12–15.

Moreover, the public has a strong interest in insuring that MarAd's decisions are made after full consideration of factors that might do severe harm to the American shipping industry. To do otherwise would undermine the Merchant Marine Act's goal of creating "a strong domestic merchant marine capable of competing with foreign carriers in the world market." *American Maritime Association, supra,* at 548. In a more general sense, the public interest also favors insuring that important administrative decisions are properly made. Where the agency's decision making process is found wanting, the equities favor a remand that permits correction of the error.

The Court of Appeals has already provided guidance as to how to balance these competing interests. In *Tanker Owners, supra,* the court stated that "we think the status quo should be maintained during the pendency of [the remand] proceedings." 690 F.2d at 931. At this time, there is no reason to express an opinion as to the proper disposition of the issues that have been remanded to the Board. By the same token, the equities do not favor the outright injunction of USL's billion-dollar enterprise. Rather, an accompanying order will declare the October 11, 1984 refusal to reopen to be a clear abuse of discretion, declare the June 2, 1982 and May 23, 1983 orders to be arbitrary, capricious and an abuse of discretion to the extent that they grant USL the authority to conduct unsubsidized services, and remand this action to MarAd for notice and comment proceedings consistent with this opinion. USL need not, however, cease its current operations pending a decision by the Board.[10]

The plaintiffs have raised significant issues regarding the proper administration of America's Merchant Marine. They have also established that their interests are likely to be injured by USL's unsubsidized service. In the interest of encouraging an expedited resolution of this case, the accompanying order will require USL to file an appropriate application for its unsubsidized services by a date certain. The Board should then, "with all dispatch,"[11] notify interested parties and give them an opportunity to comment on the issues thus raised. The plaintiffs are, of course, free to challenge any unreasonable agency delay by appropriate judicial action. *See Telecommunications Research and Action Center v. FCC,* 750 F.2d 70, 79–81 (D.C.Cir.1984); 5 U.S.C. § 706(1).

---

10. This ruling assumes that this case will be promptly remanded to MarAd for further proceedings. Should the defendant on USL choose to appeal, it may be necessary to consider whether interim injunctive relief might be appropriate pending the resolution of the appeal. The Court intimates no opinion as to the proper disposition of this issue, should it arise.

11. *Tanker Owners, supra* at 911.